# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>S.P. | No.  55238-8-II<br><br>UNPUBLISHED OPINION |

PRICE, J. — S.P. appeals the superior court's commitment order for 14 days of involuntary inpatient treatment, arguing that the superior court erred by finding that he was gravely disabled. We affirm.

## FACTS

On July 15, 2020, the State filed a petition for an initial 14-day involuntary inpatient treatment commitment.

Dr. Anca Balasu testified at S.P.'s hearing.  Dr. Balasu testified that she was familiar with S.P. and had most recently met with him the day before the hearing.  Dr. Balasu explained that S.P. had a long history of hospitalizations for paranoid schizophrenia.  Dr. Balasu also explained that S.P. would be compliant with medications while in the hospital, then refuse to take medications when out of the hospital leading to decompensation and rehospitalization.

Dr. Balasu said that S.P.'s most recent hospitalization resulted from a series of incidents at the Hudson Hotel, where S.P. had been living.  S.P. had written threats on his wall and had also taken a kitchen knife to his mattress.

Dr. Balasu testified that S.P. was diagnosed with schizophrenia of paranoid type.  Dr. Balasu explained S.P. presented with a lot of paranoid delusions.  S.P. believes that he is being

persecuted. He also believes that he is being poisoned. He is very concerned about sodium in his food causing a life threatening illness. Dr. Balasu explained,

> [S.P.] lost a lot of weight and he's—he's probably malnourished. He presented to the emergency department, like, earlier this month because his outpatient team was very worried about him losing so much weight in a very short period of time, and that links to his—his paranoid delusions in regard to food.

Verbatim Report of Proceedings (VRP) at 10. Dr. Balasu also testified that S.P.'s hygiene has been poor.

Dr. Balasu testified that S.P. is very angry and argumentative with hospital staff. He spends a lot of time talking about his delusions and is very difficult to interrupt. S.P. has no insight into his illness and insists he does not have a mental illness. Dr. Balasu testified that S.P. is very resistant to taking medication and he believes that the medication will harm him. S.P. has made it clear that he will not take medications outside of the hospital and is only interested in taking medical marijuana.

Dr. Balasu testified that she believed S.P. has manifested a severe deterioration in routine level of functioning. Dr. Balasu also believed that S.P. presents a danger of serious, physical harm for a failure to provide for his health and safety needs. Dr. Balasu testified that if release immediately, S.P.'s prognosis would be poor. It is unlikely that he would take his medications and he had not yet reached his baseline. Dr. Balasu hoped that with continued hospitalization, S.P. would stabilize after consistently taking medication for a period of time and then could be discharged safely.

S.P. also testified at the hearing. S.P. testified that he receives a monthly disability check and he had been on food stamps until his COVID check made him ineligible. S.P. explained that

he did not believe he had schizophrenia because he had read about it in a medical encyclopedia and believed that schizophrenia was a condition that occurred only when the patient was having seizures caused by certain conditions. S.P. testified that he had never had seizures.

S.P. testified that he took the anti-psychotic medication at the hospital but did not believe it was necessary because he felt fine without it. He also testified that when they gave him the medication, he vomited. S.P. was also concerned about additional side effects that could be caused when more of the medication built up in his body. S.P. claimed he had permanent damage to his brain and vision because of a previous anti-psychotic drug he had been forced to take.

S.P. testified that he was capable of taking care of himself because he was able to buy all his own groceries and was polite to other people. S.P. explained that he was only upset with the hospital staff because he was a vegetarian and they brought him meat sandwiches. However, S.P. then continued on explaining that he was a "vegetarian citizen . . . because of [his] species." VRP at 27. He continued explaining he would only eat fruits and vegetables and explained,

> [W]hen we lived on Earth without buildings and cars and all this sort of stuff we foraged for our food. So, when we found food we filled ourselves up with it, and we successfully lived for, literally, hundreds of thousands of years that way. And I would like to live that way and be healed and repaired.

VRP at 28. S.P. also explained that he had requested all food with no sodium in it and they continued to bring him brands of food that contain sodium.

When asked where he would live if released from the hospital, S.P. testified that he would try to rent a room in a different hotel or try to make amends with the manager of the Hudson Hotel. S.P. denied that he did anything wrong at the Hudson Hotel and the police refused to help prove his innocence. He claimed that the police could have just watched the video and seen that he was

innocent. On cross-examination, S.P. provided an extremely long and convoluted explanation of how he got arrested and ended up in the hospital. During this explanation, S.P. admitted that after going off his medication, he got in a fight with his sister and, later, threatened his sister with a knife.

The superior court found that S.P. "is in danger of serious physical harm resulting from the failure to provide for his/her essential needs of health of safety." Clerk's Papers (CP) at 16. The superior court also found that S.P. "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions and is not receiving such care as is essential for health and safety." CP at 16. The superior court noted the facts in support of its findings were "paranoia, lack of insight, [and] failure to take medication resulting in decompensation." CP at 17. Based on its findings, the superior court concluded that S.P. was gravely disabled. The superior court ordered 14 days of commitment for inpatient treatment.

S.P. appeals.

ANALYSIS

S.P. argues that there was insufficient evidence to support the trial court's findings of fact supporting grave disability.[1] We disagree.

---

[1] S.P. also argues that we should reject any argument that this appeal is moot. It is well established that appeals of involuntary commitment orders are not moot, even after the treatment period has ended, because prior commitments may be considered in future commitment proceedings. *In re Det. of M.K.*, 168 Wn. App. 621, 629-30, 279 P.3d (2012). Accordingly, S.P.'s appeal is not moot.

I. LEGAL PRINCIPLES

The superior court may grant a petition for 14 days of involuntary treatment if the superior court finds, by a preponderance of the evidence, that the person is gravely disabled as result of a behavioral health disorder. RCW 71.05.240(4)(a).[2] "'Gravely disabled' means a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24).

The State bears the burden of establishing a person is gravely disabled by clear, cogent, and convincing evidence. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Clear, cogent, and convincing evidence means that the ultimate fact at issue is shown to be "highly probable." *Id.* On appeal, "we will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id.* We then determine whether the superior court's finding support its conclusions. *See Id.*

II. SUBSTANTIAL EVIDENCE SUPPORTS THE SUPERIOR COURT'S GRAVE DISABILITY FINDINGS

S.P. argues that he was not gravely disabled under either prong of the definition.

---

[2] The statutes governing involuntary commitment, including RCW 71.05.020 and RCW 71.05.240, have gone through numerous legislative amendments since January 2020. None of the legislative amendments make any material changes to the definition of grave disability. Accordingly, we cite to the most current versions of the statutes.

A  RCW 71.05.020(24)(a)

Under the first prong of the gravely disabled definition, the State must prove S.P. "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety" because of a behavioral health disorder.  RCW 71.05.020(24)(a).  To meet its burden under this prong, the State must "present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded."  *LaBelle*, 107 Wn.2d at 204-05.

S.P. argues there was no evidence that he was unable to provide for his basic health and safety needs because he had been properly taking care of his day-to-day needs prior to his current hospitalization.  But this is incorrect.  Dr. Balasu testified that S.P. had severe paranoid delusions about food that were causing his outpatient treatment team serious concerns about his health, particularly his extreme weight loss.  Although being a vegetarian and avoiding foods high in sodium is not necessarily evidence of grave disability, this characterization is an oversimplification of S.P.'s paranoid delusions regarding food, which were interfering with his ability to feed himself appropriately.

Further, S.P. argues there was no evidence that he was unable to provide for his housing needs because there are only unsubstantiated allegations of his erratic behavior at Hudson Hotel, which S.P. denied.  But the incident at Hudson Hotel was not the only evidence of S.P.'s inability to provide for his essential needs.  Dr. Balasu specifically testified that S.P.'s current condition prevented him from being able to provide for his essential needs, including being able to secure

housing.  Therefore, S.P.'s condition was such that he was unable to maintain his housing needs at the time of his hospitalization.

There was sufficient evidence that S.P. was not able to provide for his essential needs including food and shelter.  Therefore, the superior court did not err in finding that S.P. was gravely disabled under the first prong of the definition.

B.  RCW 71.05.020(24)(b)

Under RCW 71.05.020(24)(b), a person is gravely disabled if his or her behavioral health disorder "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."  This standard requires "proof of significant loss of cognitive or volitional control" and "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *LaBelle*, 107 Wn.2d at 208.

S.P. argues that there was no evidence of severe deterioration in routine functioning because S.P. was in control of his faculties at the time of the hearing.  But S.P.'s own testimony showed that he was not able to provide cohesive, focused answers to the questions he was asked. And there was evidence that S.P. lost cognitive or volitional control because S.P. testified that after stopping his medication he fought with his sister and threatened her with a knife.  Further, because Dr. Balasu testified that S.P. had a history of stopping medication when he was out in the community and then decompensating, there was evidence that S.P. would not receive essential care if he was immediately released.

No. 55238-8-II

There was sufficient evidence that S.P. suffered severe deterioration of routine functioning. The superior court did not err by finding that S.P. was gravely disabled under the second prong of the statute.

We affirm the superior court's order for 14-day involuntary inpatient treatment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

VELJACIC, J.

8